UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SUSAN B. LONG, <u>et al.</u>,<br><br>    Plaintiffs,<br><br>    v.<br><br>DEPARTMENT OF HOMELAND SECURITY,<br><br>    Defendant. | Case No. 1:14-cv-00807 (CRC) |

<u>**MEMORANDUM OPINION**</u>

Plaintiffs Susan B. Long and David Burnham are professors at Syracuse University and co-directors of the university's Transactional Records Access Clearinghouse ("TRAC"). In November 2013, Long and Burnham, on TRAC's behalf, lodged a Freedom of Information Act ("FOIA") request with Immigration and Customs Enforcement ("ICE"), a bureau of the Department of Homeland Security ("DHS" or the "Department"). The request sought all data from three large databases maintained by ICE and broader electronic data maintained by U.S. Customs and Border Protection. Long and Burnham also asked to be classified as representatives of an educational institution and the news media, which would entitle them to reduced FOIA processing fees. In support of their fee classification request, they explained that TRAC regularly analyzes and distills data obtained from federal agencies into reports on government operations in areas of public interest, including immigration enforcement, which are published on TRAC's website and through other means.

Although ICE's FOIA office had previously treated TRAC as both an educational and news media requester, this time it denied Long and Burnham's request, claiming they had not adequately explained how the particular information they sought would serve TRAC's

educational and journalistic missions. Long and Burnham sued DHS to overturn ICE's determination, and both sides have moved for summary judgment. While ICE might object to the breadth of TRAC's FOIA request and question the originality and accuracy of its research reports, denying it preferred requester status is not the way to handle those concerns. Long and Burnham adequately justified their request for both educational and news media status. The Court will therefore grant their motion for summary judgment and deny the Department's.

I.     Background

In November 2013, Long and Burnham filed a request under the Freedom of Information Act, 5 U.S.C. § 552, seeking all data from three separate ICE databases: (1) the Enforcement Integrated Database ("EID"), a shared, operational database within ICE containing information on the detention and removal of undocumented immigrants, including their biographical data, criminal history, and encounters with law enforcement agents; (2) the Integrated Decision Support System, which contains selected data drawn from the larger EID; and (3) the General Counsel Electronic Management System, a legal case management database used by ICE attorneys. The request also sought unspecified Customs and Border Protection data libraries and repositories.[1]

---

[1] The request specifically sought:

> Part A: All information ["data"] currently recorded in: (i) the Enforcement Integrated Database (EID), (ii) ICE's Integrated Decision Support (IIDS) system, (iii) the General Counsel Electronic Management System (GEMS), and (iv) the U.S. Customs and Border Protection data repositories/data warehouses/data marts.
>
> Part B: With respect to the information systems mentioned in Part A, any information ["descriptive records"] prepared since the beginning of FY 2004 or having applicability to systems existing during this time period describing: (i) any of their contents, (ii) any changes in the coverage or scope of their contents, (iii) any of the processes, tools, instructions or methods for adding, deleting, modifying, checking, or validating their contents, (iv) whether any of their contents is currently maintained or updated, (v) the uses currently made of any of their contents, or (vi) the distribution of any of their contents to other data systems, or to individuals, offices, units, organizations, or locations whether inside and

In their FOIA request, Plaintiffs also asked to be charged reduced processing fees as news media and educational institution requesters. Compl. ¶ 17; 5 U.S.C. § 552(a)(4)(A)(ii)(II).[2] In support of their request, Plaintiffs explained:

> TRAC is a research data center at Syracuse University, and under the direction of its co-directors, Long and Burnham, carries out an active program of scholarly research. As its name implies, TRAC as part of its educational and service mission also serves as a clearinghouse and regularly responds to inquiries from the press, scholars, public interest groups, and other members of the public on where to find government information and the specific types of information available. One of our specialties is computerized federal databases maintained by agencies to record day-by-day activities required for managing the agency and reporting on its performance to various oversight bodies. TRAC actively seeks to promote public understanding of the operation of the federal government's immigration enforcement programs through the gathering and dissemination of this information. At TRAC, we actively gather information of interest to the public, transform this information utilizing our editorial and research expertise into various works—including computerized knowledge bases and reports—and make these works available to the public. Recent TRAC reports on immigration issues can be viewed at: http://trac.syr.edu/immigration/reports/.

Id. On numerous previous occasions, ICE and other divisions of DHS had classified Plaintiffs, acting on behalf of TRAC, as news media and educational institutional requesters. E.g., Pls.' Opp'n & Cross-Mot. Summ. J. Exs. B–D (letters from ICE granting preferred requester status). This time, however, ICE indicated that it would treat Plaintiffs as "non-commercial" requesters. Decl. of Fernando Pineiro, Sept. 4, 2014, Ex. 2 ("Pineiro Decl."). After Plaintiffs appealed that designation, ICE changed its conclusion, finding that Plaintiffs should be charged even higher fees as commercial requesters. Id. Ex. 5 at 3. Following an exchange of letters, ICE reiterated its

---

outside the agency, how and when such distributions occur or should occur and what specific contents is included in each distribution.

Compl. ¶ 16.

[2] Plaintiffs also sought a public interest fee waiver. See Decl. of Fernando Pineiro, Sept. 4, 2014, Ex. 1. Because Plaintiffs have not challenged ICE's denial of their waiver request, that issue is not before the Court. See Pls.' Opp'n & Cross Mot. Summ. J. at 33 n.15.

determination that Plaintiffs were commercial requesters. Id. Exs. 6, 7. Plaintiffs then brought this suit alleging violations of FOIA and the Administrative Procedure Act, and both parties have now moved for summary judgment.[3] The Court held a hearing on May 27, 2015.

## II.     Analysis

FOIA requires all agencies to promulgate regulations (1) specifying applicable fees for processing requests and (2) establishing guidelines for determining when fees should be waived or reduced. 5 U.S.C. § 552(a)(4)(A)(i).[4] Congress incorporated fee waivers and reductions into FOIA so that "fees [would] not be used as an obstacle to disclosure of requested information." Eudey v. Cent. Intelligence Agency, 478 F. Supp. 1175, 1177 (D.D.C. 1979). Courts review agency decisions on requester status and fee waiver requests through a "*de novo* review of the record" that was before the agency. Cause of Action v. Federal Trade Comm'n, 961 F. Supp. 2d 142, 153 (D.D.C. 2013); accord 5 U.S.C. § 552(a)(4)(A)(vii).

There are three levels of fees that a FOIA requester may be charged. If records are requested for a commercial use, the agency may charge for searching for, reviewing, and duplicating them. 5 U.S.C. § 552(a)(4)(A)(ii)(I). If records are not sought for commercial use, the fees must be limited to reasonable charges for searching and duplicating. Id. § 552(a)(4)(A)(ii)(III). And if the requester is an educational or non-commercial scientific institution, or a representative of the news media, the fees are further reduced, as the agency may only charge for duplicating. Id. § 552(a)(4)(A)(ii)(II). In order to determine which category applies, the agency looks to the activities of the requester and its likely use of the records. See

---

[3]  Plaintiffs have consented to the dismissal of their second claim, under the Administrative Procedure Act. Pls.' Opp'n & Cross Mot. Summ. J. at 1–2. The Court will therefore dismiss that claim.

[4]  DHS regulations governing fees for processing FOIA requests are codified at 6 C.F.R. § 5.11.

Elec. Privacy Info. Ctr. v. Dep't of Def., 241 F. Supp. 2d 5, 12 (D.D.C. 2003) (holding that a requester's history of publishing unique works was more than enough to justify news media status). Plaintiffs contest ICE's refusal to classify them as representatives of both an educational institution and the news media.

    A.    <u>Educational Institution Status</u>

Long and Burnham contend that they should have been charged the reduced processing fees set for educational institutions. DHS regulations define an "educational institution" to include "an institution of undergraduate higher education [or] an institution of graduate higher education . . . that operates a program of scholarly research." 6 C.F.R. § 5.11(b)(4). To be classified in this category, "a requester must show that the request is authorized by and is made under the auspices of [an educational] institution and that the records are not sought for a commercial use but are sought to further scholarly research." Id. Office of Management and Budget ("OMB") guidelines—to which agency regulations must conform, 5 U.S.C. § 552(a)(4)(A)(i)—provide the following example to guide agencies in determining whether professors qualify for "educational" status:

> [A] request from a professor of geology at a State university for records relating to soil erosion, written on letterhead of the Department of Geology, could be presumed to be from an educational institution. A request from the same person for drug information from the Food and Drug Administration in furtherance of a murder mystery he is writing would not be presumed to be an institutional request, regardless of whether it was written on institutional stationary.

OMB Uniform Freedom of Information Act Fee Schedule and Guidelines, 52 Fed. Reg. 10,012, 10,014 (Mar. 27, 1987) ("OMB Fee Guidelines").

In their initial preferred status request, Long and Burnham explained to ICE that they are Syracuse University professors and that TRAC is a Syracuse University research institute operating under their direction. They further indicated that TRAC carries out an active program

of scholarly research specializing in gathering and analyzing federal government data and that TRAC publishes its findings in research reports available on its website, which is hosted on Syracuse University servers.  After ICE denied their request, Long and Burnham submitted a 2006 letter drafted by TRAC's attorneys in connection with an earlier preferred status request and a six-page white paper elaborating on TRAC's research activities and Plaintiffs' relationship to the organization.  Pineiro Decl. Ex. 6 (attachments to letter dated Feb. 24, 2014).  Long and Burnham also drew ICE's attention to numerous bulletins and some 25 immigration-related reports that TRAC has published over the last nine years.  For example, just one month before Plaintiffs filed their FOIA request TRAC published a report analyzing immigrant detention rates before and after new ICE guidelines went into effect.  See TRAC, New ICE Detainer Guidelines Have Little Impact, Oct. 1, 2013, available at http://trac.syr.edu/immigration/reports/333/.  Long and Burnham contend that this information was sufficient to justify classifying them as representatives of an educational institution.

DHS begs to differ, offering three reasons for its conclusion that Plaintiffs do not qualify for the reduced fees charged to educational institutions.  First, it questions the extent of TRAC's connections to Syracuse University, noting that TRAC's website indicates that the center has locations outside of Syracuse and receives funding from parties other than the university.  Def.'s Mot. Summ. J. at 14.  But nothing in the FOIA statute or its implementing regulations limits the definition of "educational institution" to an entity with only one location or funding source.  Nor does the existence of TRAC's other locations or funding sources demonstrate that TRAC's connection to Syracuse University is somehow contrived.  FOIA's legislative history, moreover, instructs that "[a] request made by a professor . . . should be presumed to have been made by the [educational] institution."  Sack v. Dep't of Def., 6 F. Supp. 3d 78, 93 (D.D.C. 2013); see also

6

OMB Fee Guidelines (noting that a letter from a professor on university letterhead "could be presumed to be from an educational institution").  Plaintiffs are professors who made the request for records for use in their research at a university research center.  They were therefore entitled to a presumption of educational status.  Because DHS has not offered any persuasive evidence to rebut that presumption, the Court finds that Plaintiffs met their burden to establish that their request was authorized by and under the auspices of Syracuse University.

DHS next argues that Long and Burnham are not entitled to educational requester status because they failed to demonstrate that the particular records they seek will further scholarly research.  The Department specifically faults Plaintiffs for not indicating whether the data "will be transformed into scholarly or noncommercial research" or "will actually be placed in . . . TRAC reports."  Def's Mot. Summ. J. at 19.  While Plaintiffs perhaps could have satisfied the Department's concerns by simply providing the requested representation, the materials they submitted to ICE detailed TRAC's extensive history of analyzing records from federal databases and publishing its findings in reports on immigration enforcement.  Given TRAC's established methodology and publication history, the most logical conclusion for ICE to have drawn was that Plaintiffs intended to use the requested data for similar research reports in the future.  DHS correctly points out that TRAC's prior history is not necessarily dispositive because a requester's status can change.  See Nat'l Sec. Archive v. Dep't of Def., 880 F.2d 1381, 1388 (D.C. Cir. 1989) ("If the [requester's] intention to publish works derived from the documents it requests does not pan out, it will be open to [the agency] to argue that the [requester] is no longer a representative of the news media."); Long v. Dep't of Justice, 450 F. Supp. 2d 42, 84 (D.D.C. 2007) (denying a request to determine the status of a requester without reference to a specific fee request).  Yet ICE has offered nothing to suggest that TRAC has altered its research methodology since the agency

last granted it preferred requester status.  As a result, ICE erred in concluding that Plaintiffs did not demonstrate an intended scholarly use for the requested records.

In a similar vein, DHS maintains that Long and Burnham have failed to prove that they lack a commercial interest in the requested records.  See 6 C.F.R. § 5.11(b)(4) (requiring educational requesters to show that the records "are not sought for a commercial use").  The government's concern in this regard is not entirely unwarranted.  In addition to its research and publication activities, TRAC (as its name suggests) also serves as a clearinghouse for much of the data it obtains from the government.  It places certain data on a non-public section of its website—called the "TRACFED Data Warehouse"—and charges subscription fees to query it.  As will be further discussed below, serving as a data vendor or wholesaler is inconsistent with news media requester status.  E.g., Judicial Watch, Inc. v. Dep't of Justice, 185 F. Supp. 2d 54, 59–60 (D.D.C. 2002) (refusing to grant news media status to an "information vendor or middleman").  It could also reflect a commercial rather than scholarly motive for a records request.

That being said, "Congress did not intend for scholars (or journalists and public interest groups) to forego compensation when acting within the scope of their professional roles." Campbell v. Dep't of Justice, 164 F.3d 20, 35–36 (D.C. Cir. 1999) (concluding that a bona fide scholar's book profits did not make his activities "primarily commercial" for purposes of calculating a FOIA public interest fee waiver).  Consistent with that principle, TRAC's subscription service does not disqualify it from educational requester status so long as the request is being made to further TRAC's scholarly mission and not principally to enable it to sell the raw data to third parties.  The Court has already concluded that Plaintiffs established TRAC's scholarly interest in the records.  And Long and Burnham disavowed any overriding commercial

interest in the records by explaining to ICE that they are not remunerated for their work with TRAC beyond their university salaries and that TRAC, as a non-profit organization, charges subscription fees only to partially defray its operating costs. Pineiro Decl. Ex. 6 at 8. Accordingly, Plaintiffs adequately demonstrated a lack of commercial interest in the requested data and ICE improperly denied their request for educational requester status on that basis.

B.     News Media Status

Plaintiffs also requested that the agency classify them as representatives of the news media. FOIA provides that a representative of the news media may only be charged for document duplication. 5 U.S.C. § 552(a)(4)(A)(ii)(II). The statute explains that a "representative of the news media" is an entity that "gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." Id. DHS regulations further define a representative of the news media as a "person actively gathering news for an entity that is organized and operated to publish or broadcast news to the public" that is "about current events or that would be of current interest to the public." 6 C.F.R. § 5.11(b)(6). Like educational requesters, a news media requester may not seek the information for commercial use. Id. § 5.11(b)(1). Recognizing, however, that many news organizations are for-profit entities, the regulation explains that a news media requester may make products available "for purchase or subscription" without the request being considered for commercial use. Id. § 5.11(b)(6). The legislative history of this preferred fee category indicates the bill sponsors believed "[i]t is critical that the phrase 'representative of the news media' be broadly interpreted if the act is to work as expected." Nat'l Sec. Archive, 880 F.2d at 1386.

Plaintiffs described TRAC's relevant news media experience in their correspondence to ICE. They indicated that TRAC transforms large amounts of data it receives from the

government into distinct works that are available to the public, and they explained that TRAC's fundamental purpose is to provide information to the American people, Congress, public interest groups, and other parties regarding the enforcement activities of the federal government.  Pineiro Decl. Ex. 1 at 2, 6, 15.  TRAC's work in that regard is reflected in some 130 recent reports on immigration issues, more than 25 of which examined "the activities and functions of ICE."  Pls.' Opp'n & Cross-Mot. Summ. J. at 7–8; id. Ex. F (listing immigration-related reports).  These reports include analysis, statistics, trends, and other conclusions that a lay person would not be able to draw simply by reviewing the raw data.  E.g., id. Ex. J (analyzing "[w]hat happened to the roughly 1,500 individuals taken into custody by Immigration and Customs Enforcement (ICE) in a typical work day" on a state-by-state level).  Plaintiffs further explained that TRAC's reports are published on its website, which received some five million visits in 2013, and are frequently cited by other news organizations.  Pineiro Decl. Ex. 6 at 6.  And it is clear, Plaintiffs contend, that the enforcement of immigration laws is a topic of current interest to the public.

       These activities might seem to place TRAC well within the heartland of organizations that Congress envisioned as news media.  Not satisfied, DHS points to four purported deficiencies in Plaintiffs' submissions that it contends disqualify TRAC from news media status.  First, DHS claims that TRAC's reports are not news because they do not incorporate "information from a range of sources."  Def.'s Mot. Summ. J. at 23.  Incorporating information from a range of sources, however, is not essential for news media status.  See Nat'l Sec. Archive, 880 F.2d at 1387 (holding that, although the requester combined records "with documents from other sources," that activity was not necessary or sufficient for a requester to be considered news media).  Even if it were required, TRAC's reports appear to include at least some information from other sources.  E.g., Pls.' Opp'n & Cross-Mot. Summ. J. Ex. G (listing as sources California

and San Francisco official guidance on immigration detainers).  This rationale therefore does not constitute grounds for refusing news media status.

DHS next argues that Plaintiffs "simply regurgitate the statutory language" without specifically demonstrating why research based on the requested records will be of interest to the public.  Def.'s Mot. Summ. J. at 22–24.  But the agency cites no case, statute, or regulation to support its skepticism regarding the public's interest in reports based on the requested records.  The Court has little difficulty concluding that information about enforcement of our immigration laws would be of interest to the public.  Because the record was sufficient for the agency to reach the same conclusion, it erred in denying Plaintiffs' fee classification request on that basis.

ICE also refused to categorize TRAC as a news media requester because it determined that Plaintiffs had failed to prove that TRAC will turn the raw data into a distinct work to be distributed to the public.  Def.'s Mot. Summ. J. at 23, 25–28.  To support that determination, DHS relies primarily on two cases upholding agency denials of news media status.  Neither supports the Department's position here.  The requester in the first case described itself as "a public interest law firm [that] specializes in deterring, monitoring, uncovering, and addressing public corruption in government." Judicial Watch, 185 F. Supp. 2d at 57.  Analogizing the organization's past treatment of requested records—allowing people to inspect them at its offices and posting copies online—to that of a private library, id. at 59, the court concluded that "[m]erely making available information" does not reflect the publishing effort required to be classified as news media for purposes of FOIA, id. at 60.  The second requester was a self-styled "nonprofit organization that uses public advocacy and legal reform strategies to ensure greater transparency in government and protect taxpayer interests and economic freedom." Cause of Action, 961 F. Supp. 2d at 150.  As for creating distinct works, the organization could not identify

11

any information it had previously published or describe a work it planned to create. Id. at 162. The only evidence it offered regarding its intent and ability to disseminate information was its "relationships with media contacts." Id. at 163. In addition, the organization's website was inoperable at the time of the request, and it could not estimate how many people had viewed its content. Id. Neither requester considered publication part of its mission or had a history of drafting and disseminating unique works.

TRAC, on the other hand, describes itself as a research institute. It has published immigration reports and bulletins accessed by millions of people, and Plaintiffs stated to the agency that it will continue to do so in the future. Here, again, Plaintiffs might have avoided unnecessary litigation by explaining how they intended to use the requested records. But they were not required to do so. See Judicial Watch, Inc. v. Rossotti, 326 F.3d 1309, 1314 (D.C. Cir. 2003) (reversing a district court that required "pointless specificity" regarding an appellant's plan to disseminate information). TRAC's past activities amply demonstrated its ability to transform the requested data into a distinct work and distribute it to the public. The agency therefore had no basis for requesting further detail on this topic.

Finally, DHS suggests that TRAC should not be considered part of the news media because its research is insufficiently original. See Def.'s Mot. Summ. J. at 27 (arguing that producing TRAC's research reports requires no editorial skill because they "simply summarize" information obtained from the government). The Department cites no support for ICE's refusal to grant preferred status based on its subjective assessment of TRAC's editorial skill. Once Plaintiffs had demonstrated their ability to publish reports, ICE should not have attempted to "evaluate the quality of [the requesters'] scholarship or to specify a minimum level of expertise required." Edmonds Inst. v. Dep't of Interior, 460 F. Supp. 2d 63, 75 (D.D.C. 2006) (finding the

plaintiff was entitled to a public interest fee waiver because it had reasonably stated how it will "convey information to the public" (quoting 6 C.F.R. § 5.11(k)(2)(iii))). Plaintiffs' uncontested representations that they intend and have the ability to disseminate new research to the public were sufficient to meet the definition of representatives of the news media.

    C.    <u>Declaratory Relief</u>

In addition to a status determination with respect to this FOIA request, Plaintiffs seek a declaration that TRAC is entitled to both educational and news media status for all future requests. It is within the Court's power to issue a declaratory judgment in a FOIA matter. In <u>Payne Enterprises, Inc. v. United States</u>, for example, the D.C. Circuit upheld a declaratory judgment that the Air Force violated FOIA by refusing "in every case" to disclose information until after lawsuits were filed. 837 F.3d 486, 494 (D.C. Cir. 1988). Plaintiffs, who are frequent FOIA requesters, argue that similar declaratory relief is appropriate here because ICE's denial of preferred status in this case portends similar adverse determinations in the future. They also claim that imposition of substantial fees has impeded their research and publication activities. The Court, however, declines to issue a declaratory judgment. Agencies must make an independent fee status determination for each request and, as Plaintiffs acknowledge, ICE has granted TRAC preferred status in the past. Plaintiffs therefore have not shown that ICE has violated FOIA by systematically rejecting their fee classification requests. While ICE may have erroneously denied TRACs' request in the case, TRAC could alter its research activities in the future or request information that is inconsistent with its scholarly or journalistic interests. Absent evidence of either development, the Court is confident that ICE will assess future TRAC requests in accordance with the reasoning set forth in this opinion.

### III.     Conclusion

For the foregoing reasons, the Court will grant in part Plaintiffs' Cross Motion for Summary Judgment, dismiss Count II of the Complaint, and deny DHS's Motion for Summary Judgment.  An Order will accompany this Memorandum Opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:    June 29, 2015